F I L E D
Clerk
District Court

MAR 08 2024

for the Northern Mariana Islands
By_____
(Deputy Clerk)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| SUPERTECH, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>MY CHOICE SOFTWARE, LLC,<br><br>    Defendant. | Case No. 1:23-cv-00002<br><br>**DECISION AND ORDER GRANTING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |

## I.     BACKGROUND

Previously, the Court sua sponte dismissed Plaintiff SuperTECH, Inc.'s ("SuperTECH") complaint because it lacked subject matter jurisdiction as SuperTECH inadequately plead Defendant My Choice Software, LLC's ("MCS") citizenship as required for diversity jurisdiction. (ECF No. 11 at 3.)[1] SuperTECH then filed its verified First Amended Complaint ("FAC") asserting state law claims of fraud, breach of contract, promissory estoppel, and unjust enrichment. (FAC 13-16, ECF No. 12.) Subsequently, MCS filed a motion to dismiss on several bases (ECF No. 14) supported by a memorandum of law (Mot., ECF No. 14-1), declaration of Gabe Magana (Magana Decl., ECF No. 14-3) with various exhibits (ECF Nos. 14-4—14-5), and declaration of MCS's Chief Financial Officer John Rogers (Rogers Decl. ECF No. 14-6). SuperTECH timely filed its opposition (Opp'n, ECF No. 19) supported by declaration of Marcelo V. Masilungan (Masilungan Decl., ECF No. 19-1) with various exhibits (ECF Nos. 19-2), and declaration

---

[1] The Court's citations to page numbers of docket entries refer to the pagination created by CM/ECF.

of Michael Dotts (Dotts Decl., ECF No. 19-3).[2] (*See* ECF No. 16 (granting extension).) MCS timely filed its reply (Reply, ECF No. 22) supported by supplemental declaration of John Rogers (Rogers Suppl. Decl., ECF No. 23). (*See* ECF No. 21 (granting extension).) At the hearing on the motion, which was limited to the issue of personal jurisdiction, the Court took the matter under submission. (Mins., ECF No. 24.) Based on the parties' oral arguments, the briefs, and the record in this case, the Court GRANTS MCS's motion to dismiss for lack of personal jurisdiction and issues this decision and order detailing its rationale.

## II.     LEGAL STANDARD

The plaintiff bears the burden to establish that the district court has personal jurisdiction over the defendant. *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128-29 (9th Cir. 2003) (citation omitted). When the district court adjudicates a motion to dismiss without holding an evidentiary hearing but relies upon affidavits and discovery materials, the plaintiff is only required to make a prima facie showing of personal jurisdiction. *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir.), supplemented, 95 F.3d 1156 (9th Cir. 1996). The plaintiff "need only demonstrate facts that if true would support jurisdiction over the defendant." *Harris Rutsky*, 328 F.3d at 1129 (citations omitted). The district court accepts the plaintiff's version of facts unless directly contravened, and conflicts in facts among the affidavits "must be resolved" in the plaintiff's favor. *Id.* (citations omitted).

## III.     FACTS

The following facts are drawn from the verified FAC and the various declarations filed during the briefing of the motion to dismiss.

### A.  Background

Plaintiff SuperTECH is a Commonwealth of the Northern Mariana Islands ("CNMI") corporation

---

[2] Although the Court permitted SuperTECH to exceed the standard page limit and file an opposition up to forty-five pages long, (ECF No. 18), Plaintiff abused this privilege. The opposition brief contains sixty-three footnotes, many of which are paragraphs long and span several pages. This appears to be an attempt to exceed the page limit as its footnotes are single-spaced as opposed to double-spaced like the rest of the text within the body of the opposition. In further aggravation, Plaintiff tucks away substantive case analysis within these footnotes. Plaintiff's counsel is hereby noticed that this will not be tolerated and any such filings in the future will result in the Court disregarding the footnotes.

with its principal place of business on the island of Saipan, CNMI, and its president is Marcelo V. Masilungan. (FAC ¶¶ 4, 6.) Defendant MCS is a limited liability company ("LLC") organized in California with its principal place of business in Lake Forest, Orange County, California and is comprised of a single member, Nathan Mumme, who is a resident and citizen of California. (*Id.* ¶ 5.) MCS is an "official distributor of Microsoft Corporation" products. (*Id.*¶ 8.) From 2015 to the present day, this California-based company averages 60,000 to 70,000 orders a year. (Suppl. Rogers Decl. ¶ 5.) Of the total number of orders since 2015, 194 orders were placed by eleven individuals and businesses "who indicated an address in the [CNMI,]" which is "less than 1% of the aggregate gross sales and profits generated from all orders." (*Id.* ¶¶ 3-4, 7.) One hundred eighty-seven of those CNMI orders were placed directly via MCS's website. (*See id.* ¶ 4.) Out of the seven orders not placed directly via MCS's website, six came from Masilungan of SuperTECH. (*Id.*) "Some of Masilungan's pre-2022 orders were placed using MCS's website." (Magana Decl. ¶ 5.)  MCS neither "had any manger, employee, agent, office, or bank account within the" CNMI, nor "advertised or solicited business in any media, such as a local newspaper of the CNMI phone book, within the CNMI." (Rogers Decl. ¶¶ 8-9.) But MCS maintains a website accessible worldwide to anyone with internet access. (*Id.* ¶ 11.) When placing an order through MCS's website, a customer is shown a confirmation page with a notification that states "by placing the order, the customer agrees to all MCS's terms and conditions[,]" including a forum selection clause that specifies actions must be brought in the state or federal courts of California. (*Id.* ¶ 22; Magana Decl. ¶ 5.) MCS's terms and conditions are also on its website. (Rogers Decl. ¶ 21; Magana Decl. ¶ 5.)

Since 2018, when Masilungan first placed an order with MCS through its website, Masilungan has placed more than ten orders with MCS. (Suppl. Rogers Decl. ¶ 8; Magana Decl. ¶ 5.) SuperTECH has purchased Microsoft products through MCS since 2019. (FAC ¶ 8.) "Many of the transactions between SuperTECH and MCS were small but not all." (*Id.* ¶ 9.) For example, on January 5, 2021, SuperTECH placed an order for Microsoft products with MCS worth $174,078.48 to satisfy a CNMI procurement

contract for a CNMI agency. (*Id.* ¶¶ 9-10.) SuperTECH did not place the order via MCS's website, rather it requested a quote from MCS, who provided it through an email. (*Id.* ¶ 11.) MCS was aware that the order was being sent to the CNMI because it requested information about the end user, a CNMI agency, for registration purposes and MCS sent the CNMI agency the software license. (*Id.* ¶¶ 10, 12.)

### B. The Department of Finance Contract

In February 2022, the CNMI's Department of Finance "put out for bid the purchase of Microsoft 365 licensing" and SuperTECH sought to bid for it.  (FAC ¶¶ 14-15; Decl. Rogers ¶ 15.) SuperTECH contacted MCS directly through email, not through a website. (*Id.*) Specifically on March 10, 2022, Masilungan emailed Gabe Magana from MCS the request for a quote and provided the CNMI government's specifications for the bid. (FAC ¶¶ 7, 16; ECF No. 19-2 at 5.) On March 19, 2022, Magana emailed Masilungan a link with the quote. (FAC ¶ 23; Masilungan Decl. ¶ 10; Suppl. Rogers Decl. ¶ 10; ECF No. 19-2 at 47.) Masilungan and Magana communicated frequently via email and Zoom. (FAC ¶¶ 18, 34-36.) A Department of Finance representative joined Masilungan and Magana during at least one Zoom conference. (*Id.* ¶ 18.) During their conversations, Magana never mentioned California as the designated forum for disputes. (Masilungan Decl. ¶ 13.)[3] Masilungan asked Magana several times if MCS's quote complied with the CNMI government's specifications, and Magana assured him several times that it did. (FAC ¶¶ 34-36, 38, 46, 56.) Based on these representations, SuperTECH forewent efforts to locate other providers that could provide the product. (*Id.* ¶¶ 43-44.)

In April 2022, SuperTECH submitted its bid to the CNMI government, and was awarded the bid in May when the Acting Director of Procurement Services authorized the CNMI Secretary of Finance to implement a contract with SuperTECH. (FAC ¶¶ 45, 53, 58.) The Acting Director of the CNMI Department of Finance authorized SuperTECH to purchase the software licensing. (*Id.* ¶ 54.) A few days later on May

---

[3] On the contrary, Magana maintains that he referenced MCS's terms and conditions during these conversations. (Magana Decl. ¶ 7.) However, disputes are resolved in the plaintiff's favor for motions to dismiss for lack of personal jurisdiction and improper venue. *Harris Rutsky*, 328 F.3d at 1129 (citations omitted); *Universal Stabilization Techs., Inc. v. Adv. Bionutrition Corp.*, 17CV87-GPC(MDD), 2017 WL 1838955, at *9 (S.D. Cal. May 8, 2017).

25, 2022, Masilungan transferred $844,800.00 from SuperTECH to MCS via wire transfer, which constituted SuperTECH's full performance. (*Id.* ¶¶ 39, 55, 51.) After receipt of the funds, MCS "delivered the incorrect product to the end user in the CNMI" that failed to meet the specifications. (*Id.* ¶¶ 63-64.) Masilungan immediately notified Magana that the software license MCS sent was incorrect and did not comply with the CNMI government's requirements. (*Id.* ¶ 65.) The software was never activated or used, and the distributer canceled the software license. (*Id.* ¶¶ 66, 80.) As a result, the CNMI government cancelled the contract with SuperTECH. (*Id.* ¶ 68.) Subsequently, Magana sent Masilungan a revised quote that cost an additional $500,000 for the correct software licensing. (*Id.* ¶ 69.) Masilungan informed the CNMI government of the increased price of $500,000, but the CNMI government rejected this proposal and asked SuperTECH for repayment. (*Id.* ¶¶ 70, 72.) Masilungan requested a refund from MCS several times, but was denied; MCS's Mumme informed Masilungan that MCS would charge a 15% cancellation fee. (*Id.* ¶¶ 71, 73-74 79, 82.) To date, MCS has not repaid any money to SuperTECH. (*Id.* ¶ 84.) If MCS had provided the correct software, SuperTECH would have earned at least $55,000 in profit. (*Id.* ¶ 89.)

In support of the fraud claim, SuperTECH alleges that in MCS's communications through Magana's response to Masilungan's request for a quote, MCS intended to provide both a quote for a product that would fail to meet the specifications, and a product that would fail to meet the specifications (FAC ¶¶ 20, 41, 48.) It claims MCS "knew that Magana's representations were not true and that its product would fail to conform to the specifications." (*Id.* ¶ 92.) SuperTECH seeks the return of its $844,800 payment to MCS and at least $55,000 in lost profits as general damages, consequential damages, plus punitive damages. (FAC 17.)

The verified FAC and the subsequent declarations do not provide a copy of the contract and there is sparse reference to its terms. Masilungan specifies that "[t]he contract, which does not include a forum selection clause or choice of law provision, required MCS to deliver its product in the CNMI." (Masilungan Decl. ¶ 4.) Further, he was in the CNMI when he signed the contract. (*Id.*)

5

1

2

## IV.   DISCUSSION

MCS raises four arguments in support of its motion. First, it asserts a lack of personal jurisdiction;
second, it alleges improper venue; third, it contends that the fraud claim was not adequately plead; and
fourth, it requests transfer of the case to the Central District of California. (ECF No. 14.) Because the Court
grants the motion to dismiss for lack of personal jurisdiction, it need not address the remaining three
arguments.

### A.  Motion to Dismiss for Lack of Personal Jurisdiction

When "there is no applicable federal statute governing personal jurisdiction, the law of the state in
which the district court sits applies." *Harris Rutsky*, 328 F.3d at 1129 (citation omitted). The long-arm
statute for the CNMI "subjects both residents and nonresidents to the Court's jurisdiction to the fullest
extent allowable under the due process standards of the U.S. Constitution." *Saipan Air, Inc. v. Stukes*, No.
1:12-CV-00015, 2013 WL 670026, at *3 (D. N. Mar. I. Feb. 25, 2013) (quoting *Bank of Saipan v. Superior
Court*, 2001 MP 5 ¶ 38 (per curiam)). Therefore, the inquiry is whether the court's exercise of personal
jurisdiction over the defendant comports with the limits imposed by federal constitutional due process. *Id.*

"For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must
have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not
offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).
General jurisdiction and specific jurisdiction are the "two forms of personal jurisdiction that a forum state
may exercise over a nonresident defendant[.]" *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008).

#### i.   General Jurisdiction

"[A] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations
to hear any and all claims against them when their affiliations with the State are so 'continuous and
systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S.

6

117, 126 (2014) (citations omitted). The Supreme Court "d[id] not foreclose the possibility that in an exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19. For example, Ohio was deemed the "principal, if temporary, place of business" of a company incorporated in the Philippines that ceased its operations during World War II when the Japanese occupied the Philippines because the company's president moved to Ohio and oversaw the company's activities from there. *Id.* at 129 (first citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952); and then citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780, n. 11 (1984)). Factors relevant for determining general jurisdiction include whether the defendant has offices or staff in the forum state, is registered to do business in the state, has a registered agent for service of process, and pays state taxes. *See Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1225 (9th Cir. 2011) (citations omitted).

There does not appear to be a clear binding test for determining whether a court may exercise general jurisdiction over an LLC. *See Frank v. PNK (Lake Charles) L.L.C.*, 947 F.3d 331, 337 n.10 (5th Cir. 2020) (recognizing that "neither the Supreme Court nor a sister circuit has directly addressed whether the type of artificial entity, *e.g.*, partnership or limited liability company, affects the 'at home' analysis"); *Avus Designs, Inc. v. Grezxx, LLC*, 644 F. Supp. 3d 963, 977-78 (D. Wyo. Dec. 2, 2022) (noting same). Rather than treat an LLC like a corporation who is at home in its place of incorporation and principal place of business, or employ the diversity jurisdiction rules for LLC, which determines citizenship of an LLC based on its members' citizenship, the Court focuses its inquiry on whether a LLC's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *See Frank*, 947 F.3d at 337 n.10 (collecting cases where courts "have applied the 'at home' test to entities other than corporations, albeit without analyzing whether the entity type changes the outcome"); *Avus Designs, Inc.*, 644 F. Supp. at 978 (recognizing the tension between treating an LLC like a corporation for general

personal jurisdiction purposes and recognizing that a LLC is not a corporation for purposes of diversity jurisdiction). Generally, "an LLC is 'at home' in its state of organization, and is therefore subject to general personal jurisdiction within that state consistent with the Due Process Clause. *Avus Designs, Inc.*, 644 F. Supp. at 978 (citing *Daimler AG*, 571 U.S. at 139).

Here, it is clear that MCS is not at home in the CNMI as it does not have an office or staff in the CNMI. Instead, it is organized in California, its single member is located in California, and its principal place of business is in California. (FAC ¶ 5; Rogers Dec. ¶¶ 8-9.) SuperTECH argues that the facts may present "an exceptional case," which may be flushed out during jurisdictional discovery. (Opp'n 30.) However, the Court rejects this speculative argument because MCS's activities in the CNMI do not rise to such a level that it can be considered at home in the CNMI. *See Daimler AG*, 571 U.S. at 138 n.19 (refusing to apply the "exceptional case" standard as the defendant's activities in the forum state "plainly do not approach that level"). MCS has neither "had any manger, employee, agent, office, or bank account within the" CNMI, nor "advertised or solicited business in any media, such as a local newspaper of the CNMI phone book, within the CNMI." (Rogers Decl. ¶¶ 8-9.) Therefore, the Court concludes that it does not have general personal jurisdiction over MCS.

### ii.  Specific Jurisdiction

To determine whether the exercise of specific jurisdiction over a defendant is appropriate, district courts apply a three-prong test:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Harris Rutsky*, 328 F.3d at 1129 (citation omitted). Once "the plaintiff establishes both prongs one and two, the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable."  *Boschetto*, 539 F.3d at 1016 (citation omitted). As shown in the following analysis,

Plaintiff SuperTECH fails to establish the first prong and therefore the Court lacks specific personal jurisdiction over MCS as well. *See id.* ("if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed" (citation omitted)).

### a.  Prong One – Purpose Availment or Purposeful Direction

For the first prong of this test, courts apply a "purposeful availment" standard for contract claims and a "purposeful direction" standard for tort claims. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020) (first citing *Fred Martin Motor Co.*, 374 F.3d at 802; and then citing *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015)). Both standards are relevant here where the case involves contract and tort claims – essentially, both standards "ask whether defendants have voluntarily derived some benefit from their interstate activities such that they 'will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts.'" *Id.* (first citing *Picot*, 780 F.3d at 1212; and then quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)).

### 1.  Purposeful Availment (contracts)

"To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" *Boschetto*, 539 F.3d at 1016 (citation omitted). The quantitative number of contracts is not relevant for personal jurisdiction as the inquiry focuses on "the content or qualitative nature of the contract[;]" a defendant's single act can be the basis for personal jurisdiction "if that act creates a 'substantial connection' with the forum." *Id.* at 1017 n.3 (first quoting *Burger King*, 471 U.S. at 476 n.18; then citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

> [W]here the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475-76 (citations omitted). In *Boschetto*, the defendants did not avail themselves

9

to the forum state as the transaction was a single sale of a car and the contract neither created continuing commitments nor required the defendants "engage in any substantial business" with the forum state. *Boschetto*, 539 F.3d at 1017; *cf. Burger King*, 471 U.S. at 479-81 (concluding defendant purposefully availed himself when he entered a 20-year interdependent franchise contract with a corporation in the forum state). Relevant factors for determining whether a defendant availed itself to a forum include "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990) (quoting *Burger King*, 471 U.S. at 479). In *Sher*, the Ninth Circuit concluded that the defendant did not purposefully avail itself to the forum state where it was "solicited in its home state and t[ook] no action to promote business within the forum state." *Id.* at 1363. Similarly and recently, in *Davis v. Cranfield Aerospace Solutions, Ltd.*, the Ninth Circuit concluded that "nothing in the contract negotiation reflects [the defendant's] intent to avail itself of [the forum state's] laws." *Davis*, 71 F.4th 1154, 1164 (9th Cir. 2023), *cert. denied*, 2024 WL 674875 (2024) (quoting *Sher*, 911 F.2d at 1363). The defendant "never advertised or marketed services in" the forum state and did not initiate contact to a party in the forum state but was rather solicited by the party via phone and email. *Id.* Further, "[n]egotiations between the two parties continued remotely." *Id.* "The 'unilateral activity' of another party" does not constitute purposeful availment since "the fact that a contract envisions one party discharging his obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction over another party to the contract." *Id.* at 1163, 1165 (citations omitted).

Here, on balance, the factors weigh in favor of finding that MCS has not purposefully availed itself of doing business in the CNMI. Although MCS made around 194 sales to eleven individuals and businesses in the CNMI, such sales account for "less than 1% of the aggregate gross sales and profits generated from all orders." (FAC ¶¶ 3-4, 7.) Moreover, purposeful availment does not focus on the number of contracts but the nature of the contracts. *Boschetto*, 539 F.3d at 1017 n.3 (citations omitted). Unlike the twenty-year franchise contract in *Burger King*, the sale of the Microsoft licensing did not create continuing

commitments between MCS and SuperTECH. MCS is more akin to the defendant in *Davis* who did not avail itself to the forum state. MCS also did not advertise or market in the CNMI and did not initiate contact; rather, SuperTECH initially solicited MCS via email for the purchase. (Rogers Decl. ¶¶ 9, 15; FAC ¶¶ 14-15.) Further, MCS and SuperTECH's contract negotiations were virtual via email and Zoom. (*See* FAC ¶¶ 18, 34-36.) It is unreasonable to subject MCS to the burdens of litigation in the CNMI based on SuperTECH's actions. Accordingly, this Court concludes SuperTECH has failed to establish prong one of the three prong test to exercise specific jurisdiction over MCS for its breach of contract claim.

### 2. *Purposeful Direction (torts)*

The Court next applies the second method of establishing the first prong of the specific jurisdiction analysis for the tort claim of fraud. Under the purposeful direction test, "[t]he defendant must have '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017) (citation omitted). For cases involving intentional torts, two principles dictate the "defendant-focused" inquiry:

> First, the relationship between the nonresident defendant, the forum, and the litigation "must arise out of contacts that the 'defendant *himself*' creates with the forum State." . . . Second, the minimum contacts analysis examines "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."

*Id.* at 1068 (quoting *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014)).

Here, accepting the FAC's factual allegations as true, the first part of the purposeful direction test is satisfied as MCS committed an intentional act when it made numerous false representations to SuperTECH that it would be able to quote and provide software that complied with the CNMI agency's requirements. In support of these representations to SuperTECH, MCS provided the links for the software that allegedly complied with procurement requirements. Additionally, the third element is met because MCS caused harm it knew was likely to be suffered in the CNMI. Specifically, MCS knew that the product was for the CNMI government such that its false representations about its ability to provide said products

would cause harm in the CNMI.

However, SuperTECH is unable to establish the second element that MCS's actions were expressly aimed at the CNMI, the forum state. Individualized targeting wherein the defendant "engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state" is "relevant to the minimum contacts inquiry" but is alone "insufficient to comply with due process." *Axiom Foods,* 874 F.3d at 1069-70. "[A] broadly accessible web platform knowingly profits from consumers in the forum state is not sufficient to show that the defendant is expressly aiming its intentional conduct there." *Briskin v. Shopify*, 87 F.4th 404, 419 (9th Cir. 2023) (citations omitted). In contrast, "'operating a website "in conjunction with 'something more'—conduct directly targeting the forum—is sufficient'" to satisfy the express aiming requirement." *Briskin*, 87 F.4th at 417 (citations omitted). "[T]o establish the 'something more' needed to demonstrate express aiming in suits against internet platforms, the plaintiff must allege that the defendant platform has a 'forum-specific focus'" or "allege that the defendant is specifically 'appeal[ing] to . . . an audience in a particular state,' or 'actively target[ing]' the forum state." *Id.* at 419-20 (citations omitted). The defendant must have "some prioritization of the forum state, some differentiation of the forum state from other locations, or some focused dedication to the forum state which permits the conclusion that the defendant's suit-related conduct 'create[s] a substantial connection with the forum.'" *Id.* at 420 (quoting *Walden*, 571 U.S. at 284).

With the instant case, MCS maintains an interactive website where anyone with internet access can purchase its products. (Rogers Decl. ¶ 11.) Fatally though, SuperTECH has not demonstrated the existence of "something more." MCS's website that sells Microsoft products does not have a CNMI-specific focus unlike "a specific focus on the California-centered celebrity and entertainment industries." *Briskin*, 87 F.4th at 418 (quoting *Mavrix*, 647 F.3d at 1230). Further, MCS has not specifically appealed to the CNMI nor actively targeted the CNMI as it neither "had any manager, employee, agent, office, or bank account within the" CNMI, nor "advertised or solicited business in any media, such as a local newspaper of the

CNMI phone book, within the CNMI." (Rogers Decl. ¶¶ 8-9.) MCS has not prioritized the CNMI nor differentiated the CNMI from other locations. Rather, it was SuperTECH that reached out to MCS via the internet using email. MCS did not reach out to the consumers in the CNMI. Therefore, the Court concludes that MCS has not expressly aimed its intentional acts at the CNMI such that there is no purposeful direction.

*b.   Prongs Two and Three – Relation and Reasonableness*

Because SuperTECH has failed to establish purposeful direction or purposeful availment, as required for the first prong of the specific personal jurisdiction test, the Court need not address the second and third prongs of the aforementioned test. SuperTECH has failed to meet its burden to establish specific personal jurisdiction.

## V.   CONCLUSION

Based on the foregoing, the Court GRANTS Defendant My Choice Software, LLC's motion to dismiss this action for lack of personal jurisdiction. Because of this dismissal, the Court does not address MCS's three alternative arguments regarding venue and the fraud claim. The Court DISMISSES the action without prejudice and directs the Clerk of Court to close the case.

IT IS SO ORDERED this 8th day of March 2024.

_____
RAMONA V. MANGLONA
Chief Judge